STATE OF CONNECTICUT *v.* RUBEN BERGER
(SC 15825)

Callahan, C. J., and Borden, Berdon, Katz and Palmer, Js.

Argued February 17—officially released June 1, 1999

*Louis S. Avitabile*, special public defender, for the appellant (defendant).

*Robert J. Scheinblum*, assistant state's attorney, with whom were *Cynthia Serafini*, assistant state's attorney, and, on the brief, *John A. Connelly*, state's attorney, for the appellee (state).

CALLAHAN, C. J. The defendant, Ruben Berger, appeals from a judgment of conviction, rendered after a jury trial, of possession of a narcotic substance with the intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (a), conspiracy to possess a narcotic substance with intent to sell by a person who is not drug-dependent in violation of General Statutes §§ 53a-48 (a) and 21a-278 (a), and possession of drug paraphernalia in violation of General Statutes § 21a-267 (a).[1] On appeal,[2] the defendant claims

---

[1] General Statutes § 21a-278 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person one or more preparations, compounds, mixtures or substances containing an aggregate weight of one ounce or more of heroin, methadone or cocaine or an aggregate weight of one-half gram or more of cocaine in a free-base form or a substance containing five milligrams or more of lysergic acid diethylamide, except as authorized in this chapter, and who is not, at the time of such action, a drug-dependent person, shall be imprisoned for a minimum term of not less than five years nor more than twenty years; and, a maximum term of life imprisonment. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

General Statutes § 21a-267 (a) provides: "No person shall use or possess with intent to use drug paraphernalia, as defined in subdivision (20) of section 21a-240, to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain or conceal, or to inject, ingest, inhale or otherwise introduce into the human body, any controlled substance as defined in subdivision (9) of section 21a-240. Any person who violates any provision of this subsection shall be guilty of a class C misdemeanor."

[2] Although the defendant's filing of the appeal with this court was improper, we retained jurisdiction over it pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

that the trial court improperly: (1) determined that the evidence was sufficient to support the judgment of conviction for possession of narcotics with intent to sell and for conspiracy to possess narcotics with intent to sell; (2) denied his motion to strike certain business records prepared by Northeast Utilities Company (Northeast); (3) denied his request for a jury instruction regarding third party culpability; and (4) determined that the evidence was sufficient to support a finding that the defendant was in exclusive possession of the apartment from which the drugs were seized. We affirm the trial court's judgment of conviction.

The jury reasonably could have found the following facts. In August, 1996, detectives from the vice and intelligence unit of the Waterbury police department instituted an investigation of the defendant's brother, Richard Berger. The detectives suspected that Richard Berger had been conducting illegal narcotics activities from an apartment located at 35-16 Mountain Village Road, Waterbury (apartment).

The apartment was leased to the defendant's girlfriend, Tayna Coles, and the electric utilities for the apartment were listed in the defendant's name. The defendant, Coles and the couple's three children, however, lived elsewhere in Waterbury.

On August 15, 1996, the detectives met with a confidential informant and requested that the informant attempt to purchase illegal narcotics from Richard Berger. The informant called Richard Berger and arranged to meet him later that day to purchase cocaine. Thereafter, the detectives established surveillance of the apartment and of the location where the confidential informant had arranged to meet Richard Berger. Shortly before the confidential informant was to meet Richard Berger, the detectives observed the defendant arrive and enter the apartment with a key. The defendant

remained in the apartment for approximately five minutes. Upon leaving the apartment, the defendant drove to a parking lot, where he was observed handing an unidentified object to Richard Berger. After receiving the object from the defendant, Richard Berger drove to the prearranged meeting with the confidential informant and sold cocaine to the informant.

On the evening of August 20, 1996, the detectives again placed the apartment under surveillance and observed the defendant enter the apartment with a key. Shortly thereafter, a woman entered the apartment. The detectives continued to watch the apartment for approximately thirty minutes and then terminated their surveillance.

The detectives again arranged for a confidential informant to purchase cocaine from Richard Berger on August 27, 1996. On that day, the detectives conducted surveillance of the apartment, of the location where the arranged sale was to occur, and of Richard Berger himself. While under surveillance, Richard Berger arrived at the apartment and entered with a key. Shortly thereafter, he left the apartment and drove directly to the prearranged meeting with the confidential informant. At that meeting, Richard Berger sold cocaine to the confidential informant. Approximately thirty minutes later, the defendant arrived at the apartment and entered with a key. The defendant remained in the apartment for approximately twenty minutes. The detectives concluded their surveillance shortly after the defendant left the apartment.

Thereafter, the detectives obtained a warrant to search the apartment for illicit drugs. On August 28, 1996, officers of the Waterbury police department executed a search of the apartment. Upon entering, the officers found the defendant, Richard Berger and a

young male sitting at the kitchen table. There was virtually no furniture or food in the apartment. The defendant told the police officers that none of the three lived in the apartment, but that the clothing hanging in the bedroom closet belonged to him. The officers then searched the apartment.

During the search, the officers discovered and seized crack cocaine and various items of drug paraphernalia. The majority of the cocaine was found in and on top of a heavy locked safe located in an open storage closet. The officers also found three packets of cocaine in the pocket of a black leather jacket that was hanging in the bedroom closet. The police also found a framed, poster-size picture of the defendant in the bedroom. The picture had a $100 bill inserted under the glass in the frame. In addition to the cocaine, officers seized several straight edge razor blades, small plastic baggies and digital scales, all of which are commonly used in connection with the packaging and sale of narcotics. Moreover, cocaine residue subsequently was discovered on the digital scales.

Thereafter, the defendant, Richard Berger and the young male were placed under arrest. While the three men were waiting to be transported to the Waterbury police station, one of the officers overheard the defendant and Richard Berger tell one another that each would "take the weight" for the drugs. Additional relevant facts will be supplied as necessary.

I

The defendant's first claim is that the trial court's denial of his motion for a judgment of acquittal was improper because there was insufficient evidence to sustain his convictions. Specifically, the defendant contends that: (1) the evidence was insufficient to convict him of possession of narcotics with intent to sell, because it was not capable of supporting a finding that

he had possessed the drugs that were seized from the apartment; and (2) the evidence was insufficient to convict him of conspiracy to possess narcotics with intent to sell, because it was not capable of supporting a finding that there had been an agreement between the defendant and his brother, Richard Berger. We disagree with both of the defendant's contentions.

In reviewing a sufficiency of the evidence claim, "we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994); see *State* v. *DeJesus*, 236 Conn. 189, 195, 672 A.2d 488 (1996). In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. *State* v. *Sivri*, supra, 132–33. The trier may "draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) Id. "As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt; *State* v. *Ford*, 230 Conn. 686, 693, 646 A.2d 147 (1994); *State* v. *Patterson*, [229 Conn. 328, 332, 641 A.2d 123 (1994)]; *State* v. *Little*, 194 Conn. 665, 671–72, 485 A.2d 913 (1984); nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. *State* v. *Sivri*, supra, 134. On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence

that supports the jury's verdict of guilty. Id." (Internal quotation marks omitted.) *State* v. *DeJesus*, supra, 196.

## A

The defendant's first claim of evidentiary insufficiency is that the evidence was not capable of supporting the conclusion that he possessed the cocaine seized from the apartment. "In order to prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it." *State* v. *Alfonso*, 195 Conn. 624, 633, 490 A.2d 75 (1985). "Where, as here, the cocaine was not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact." *State* v. *Elijah*, 42 Conn. App. 687, 698, 682 A.2d 506, cert. denied, 239 Conn. 936, 684 A.2d 709 (1996); see also *State* v. *Brunori*, 22 Conn. App. 431, 436, 578 A.2d 139, cert. denied, 216 Conn. 814, 580 A.2d 61 (1990); *State* v. *Santiago*, 17 Conn. App. 273, 278, 552 A.2d 438 (1989); *State* v. *Melillo*, 17 Conn. App. 114, 117–18, 550 A.2d 319 (1988). One factor that may be considered in determining whether a defendant is in constructive possession of narcotics is whether he is in possession of the premises where the narcotics are found. See *State* v. *Alfonso*, supra, 633. "Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference." (Internal quotation marks omitted.) Id.

In the present case, there was ample evidence to support a finding that the defendant shared possession of the apartment with Richard Berger. The electric utility bill for the apartment was in the defendant's name

and under his social security number. The apartment was leased to the defendant's girlfriend, Coles. The defendant, Coles and their three children lived elsewhere in Waterbury. Furthermore, on multiple occasions, the defendant was observed entering the apartment with a key. Finally, a framed poster-size picture of the defendant was found in the bedroom, and clothing belonging to the defendant was found in the bedroom closet.

Moreover, the defendant's statement to his brother that he would "take the weight" for the drugs, and his statement to the police that clothing, in which cocaine subsequently was found, belonged to him, provided the necessary supporting evidence that the defendant knew of the presence of the cocaine and had exercised dominion and control over it. See id., 633–34 (statement by defendant that cocaine seized from multiple occupant apartment was his sufficient to show possession). We conclude, therefore, that the evidence was capable of supporting a conclusion that the defendant was in constructive possession of the cocaine seized from the apartment.

B

The defendant's next claim of evidentiary insufficiency is that the evidence was not capable of supporting a conclusion that the defendant and Richard Berger had entered into an agreement to conduct illegal narcotics activity. "To establish the crime of conspiracy under [§ 53a-48], the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy . . . . The state must also show intent on the part of the accused that conduct constituting a crime be performed." (Internal quotation marks omitted.) *State* v. *Rouleau*, 204 Conn. 240, 258, 528 A.2d 343 (1987). "The existence of a formal agreement between

the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act." *State* v. *Ortiz*, 169 Conn. 642, 645, 363 A.2d 1091 (1975); see *State* v. *Lewis*, 220 Conn. 602, 607, 600 A.2d 1330 (1991); *State* v. *Vessichio*, 197 Conn. 644, 656, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986).

Because of the secret nature of conspiracies, a conviction usually is based on circumstantial evidence. *State* v. *Vessichio*, supra, 197 Conn. 656. "Consequently, it is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words 'we have an agreement.' . . . Indeed, a conspiracy can be inferred from the conduct of the accused"; (citation omitted; internal quotation marks omitted) *State* v. *Elijah*, supra, 42 Conn. App. 696; and his coconspirator, as well as from the circumstances presented as evidence in the case.

The defendant and Richard Berger each were observed entering the apartment with a key on multiple occasions. There was virtually no furniture or food in the apartment. Detective Michael Gugliotti, an expert in the field of narcotics trafficking in the Waterbury area, opined that the apartment had been used exclusively as a "stash house" for the packaging and sale of illicit drugs. Moreover, each brother was overheard stating that he would "take the weight" for the drugs that were seized from the apartment. We conclude, therefore, that the evidence was capable of supporting a conclusion that the defendant and Richard Berger had engaged in a mutual plan to possess cocaine with the intent to sell. The defendant's claims of evidentiary insufficiency on this issue are without merit.

## II

The defendant next claims that the trial court improperly denied his motion to strike certain evidence. Specifically, the defendant maintains that Northeast's records

pertaining to electric service at the apartment (account records) should not have been admitted into evidence. We disagree.

The following additional facts and procedural history are relevant to this claim. In order to establish that the account records were admissible as business records, the state presented the testimony of Thomas DellaCamera, a regional manager with Northeast, whose responsibilities included the supervision and processing of Northeast's accounts. Outside the presence of the jury, DellaCamera testified that: the account records were made in the ordinary course of business; it is the general practice of Northeast to record such information; and the records were made at or near the time of the event set forth in the records, by a person or persons with knowledge of those events. Moreover, DellaCamera testified that, in order to establish an account with Northeast over the telephone, an applicant is required to provide certain personal information that Northeast uses to verify the applicant's identity and credit history. Specifically, an applicant is required to provide Northeast with: (1) his or her name; (2) his or her social security number; (3) the telephone number of a personal reference; and (4) the telephone number at which he or she can be contacted. DellaCamera further testified that Northeast's account representatives are trained to verify the caller's identity by cross-referencing the name and social security number supplied by the applicant.

The account records indicate that on July 2, 1997, a person using the name "Rubin [sic] Berger" called Northeast and requested electric service for the apartment. The caller provided Northeast with the defendant's social security number and the telephone number of the defendant's mother, who was to be used as a personal reference. The account records indicate that the telephone number at which the caller indicated that

he could be reached was listed to David Turner, who otherwise was not shown to have any connection to the defendant.

The defendant objected to the admission of the account records on the ground that they were more prejudicial than probative. The court overruled the defendant's objection. Thereafter, DellaCamera was permitted to testify in the presence of the jury, and the account records were admitted into evidence as an exhibit.

The defendant subsequently moved to strike the account records, claiming in essence that the statements contained in the records constituted inadmissible hearsay, and that those statements were not properly authenticated as statements made by the defendant. The court concluded that, even if the statements contained in the report were hearsay, they had been properly authenticated as statements made by the defendant, and, consequently, the statements were within the exception to the hearsay rule applicable to admissions by a party opponent. It is on that basis that the trial court denied the defendant's motion to strike.

As a threshold matter, we set forth the standard by which this court reviews a challenge to a trial court's denial of a motion to strike. The trial court's ruling on the admissibility of evidence is entitled to great deference. *State* v. *Castonguay*, 218 Conn. 486, 497, 590 A.2d 901 (1991); *State* v. *Sharpe*, 195 Conn. 651, 659, 491 A.2d 345 (1985). "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Coleman*, 241 Conn. 784, 789, 699 A.2d 91

(1997). Moreover, evidentiary rulings "will be over-turned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Beliveau*, 237 Conn. 576, 592, 678 A.2d 924 (1996); *State* v. *Colton*, 227 Conn. 231, 260, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996).

We begin by reviewing briefly the business records exception to the hearsay rule. "To be admissible under the business record exception to the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions set forth in General Statutes § 52-180.[3] The court must determine, before concluding

---

[3] General Statutes § 52-180 provides: "(a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter.

"(b) The writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility.

"(c) Except as provided in the Freedom of Information Act, as defined in section 1-200, if any person in the regular course of business has kept or recorded any memorandum, writing, entry, print, representation or combination thereof, of any act, transaction, occurrence or event, and in the regular course of business has caused any or all of them to be recorded, copied or reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other process which accurately reproduces or forms a durable medium for so reproducing the original, the original may be destroyed in the regular course of business unless its preservation is otherwise required by statute. The reproduction, when satisfactorily identified, shall be as admissible in evidence as the original in any judicial or administrative proceeding, whether the original is in existence or not, and an enlargement or facsimile of the reproduction shall be likewise admissible

that it is admissible, that the record was made in the regular course of business, that it was the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter." (Internal quotation marks omitted.) *Bell Food Services, Inc.* v. *Sherbacow,* 217 Conn. 476, 485, 586 A.2d 1157 (1991), quoting *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W.,* 190 Conn. 371, 383–84, 461 A.2d 422 (1983). The defendant does not dispute that *all three* criteria have been satisfied in the present case.

The fact that the account records constitute a business record within the meaning of § 52-180, however, does not complete our analysis of the defendant's claim. "Once these criteria have been met by the party seeking to introduce the record, however, it does not necessarily follow that the record itself is generally admissible, nor does it mean that everything in it is required to be admitted into evidence. . . . For example, the information contained in the record must be relevant to the issues being tried. . . . In addition, the information contained in the report must be based on the entrant's own observation or on information of others whose business duty it was to transmit it to the entrant. . . . If the information does not have such a basis, it adds another level of hearsay to the report which necessitates a separate exception to the hearsay rule in order to justify its admission." (Citations omitted; internal quotation marks omitted.) *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W.,* supra, 190 Conn. 384–85. We must determine, therefore, whether the information contained in the account records was

in evidence if the original reproduction is in existence and available for inspection under direction of court. The introduction of a reproduced record, enlargement or facsimile shall not preclude admission of the original.

"(d) The term 'business' shall include business, profession, occupation and calling of every kind."

hearsay. If the information was hearsay, in order for the records to be admissible, the information must be within another recognized exception to the hearsay rule.

The defendant claims that the following information contained in the account records is inadmissible: (1) electric service was acquired by a person using the name "Rubin [sic] Berger"; (2) electric service was acquired by a person using the defendant's social security number; and (3) electric service was acquired by a person who listed the telephone number of the defendant's mother, who was to be used as a personal reference. That information was within the knowledge of the Northeast account representative. Moreover, at the hearing in limine conducted to determine whether the account records constituted a business record within the meaning of § 52-180, the court stated that the account records were offered "[t]o show the records of Northeast Utilities that the utilities *are in his name* . . . ." (Emphasis added.) Similarly, in its closing argument, the state contended that the "[u]tilities [for the apartment] *are in his name.*" (Emphasis added.) The record, therefore, reveals that the state introduced the account records for the limited purpose of showing that electrical service for the apartment was obtained and billed in the defendant's name. The records were not introduced to prove the truth of any statements that the caller made to the account representative, or to establish the identity of the caller. Consequently, the contents of the records are not hearsay. Therefore, no further exception to the hearsay rule or authentication was required.

Moreover, even if we were to assume, without deciding, that the caller's statements to the entrant were hearsay, the account records still would be admissible because the statements made by the caller to the entrant were properly authenticated as statements made by the

defendant. As such, they are within the exception to the hearsay rule applicable to admissions by a party opponent.

"Authentication is . . . a necessary preliminary to the introduction of most writings in evidence . . . ." (Internal quotation marks omitted.) *New England Savings Bank* v. *Bedford Realty Corp.*, 246 Conn. 594, 604, 717 A.2d 713 (1998); see also 2 C. McCormick, Evidence (4th Ed. 1992) § 218, p. 36; C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 10.1, p. 289. In general, a writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence. *New England Savings Bank* v. *Bedford Realty Corp.*, supra, 604; see also 2 C. McCormick, supra, §§ 219 through 228, pp. 38–58; C. Tait & J. LaPlante, supra, §§ 10.3 through 10.4, pp. 290–94.

Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. *United States* v. *Goichman*, 547 F.2d 778 (3d Cir. 1976); see also 2 C. McCormick, supra, § 227, pp. 53–54. Rather, there need only be a prima facie showing of authenticity to the court. 2 C. McCormick, supra, p. 54; C. Tait & J. LaPlante, supra, § 10.1, p. 289. Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the jury, which will ultimately determine its authenticity. 2 C. McCormick, supra, p. 54; C. Tait & J. LaPlante, supra, p. 289. The only requirement is that there have been substantial evidence from which the jury could infer that the document was authentic. See generally 2 C. McCormick, supra, p. 54; C. Tait & J. LaPlante, supra, p. 289.

Communications offered over the telephone may be authenticated by circumstantial evidence, if the party

calling, in addition to stating his identity, relates facts and circumstances that, taken with other established facts, tend to reveal his identity. See *Hartford National Bank & Trust Co.* v. *DiFazio*, 6 Conn. App. 576, 585, 506 A.2d 1069, cert. denied, 200 Conn. 805, 510 A.2d 192 (1986); see also 2 C. McCormick, supra, § 226, pp. 51–52; C. Tait & J. LaPlante, supra, § 10.4.2, pp. 293–94. In the present case, the account records reveal that the caller identified himself as "Rubin [sic] Berger." Although the defendant spells his first name "Ruben," DellaCamera testified that it is not uncommon for a Northeast account representative to misspell an applicant's name. Moreover, the caller provided Northeast with the defendant's social security number and the telephone number of the defendant's mother. The information given by the caller provided substantial support for the inference that the caller was the defendant and, therefore, the state satisfied its burden of making a prima facie showing of authenticity. Consequently, the statements were within the exception to the hearsay rule applicable to admissions by a party opponent, and thus, the account records that contained those statements were admissible as business records.

### III

The defendant's next claim is that the trial court improperly denied his request for a specific instruction on the relationship between third party culpability evidence and the concept of proof beyond a reasonable doubt. We disagree.

We previously have stated that "[a] request to charge which is relevant to the issues of the case and which is an accurate statement of the law must be given. A refusal to charge in the exact words of a request [however] will not constitute error if the requested charge is given in substance." *State* v. *Casey*, 201 Conn. 174, 178, 513 A.2d 1183 (1986). Moreover, "[w]hen reviewing

the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Denby*, 235 Conn. 477, 484–85, 668 A.2d 682 (1995); *State* v. *Leroy*, 232 Conn. 1, 8, 653 A.2d 161 (1995).

The defendant requested that the trial court specifically instruct the jury on the effect and purpose of third party culpability evidence.[4] Specifically, the defendant requested that the court instruct the jury in part as follows: "The primary object of third party suspect testimony is not to prove the guilt of the third party but to disprove the guilt of the accused. If it raises a reasonable doubt of his guilt it accomplishes its object." Although

[4] The defendant requested that the trial court instruct the jury on the issue of third party culpability as follows: "A defendant may introduce evidence which indicates that a third party, and not the defendant, committed the crime with which the defendant is charged. The defendant, however, must show some evidence which, if believed, tends to directly connect a third party to the crime with which the defendant is charged. The primary object of third party suspect testimony is not to prove the guilt of the third party but to disprove the guilt of the accused. If it raises a reasonable doubt of his guilt it accomplishes its object.

"In the present case, if you find that such evidence of a third party suspect has been introduced, the state has the burden of disproving such third party suspect evidence beyond a reasonable doubt. In other words, if after a full and fair consideration and comparison of all the evidence, you have left in your minds a reasonable doubt indicating that the alleged third party culprit, Richard Berger, may be responsible for the drugs that were found in the apartment at 35-16 Mountain Village Road . . . then it would be your duty to acquit the accused, Ruben Berger."

we acknowledge that this portion of the defendant's request sets forth an accurate statement of law and is relevant to the issues in the case,[5] we conclude that the trial court was not obligated to provide the requested instruction to the jury because the substance of the requested instruction was implicit in the court's charge and did not require further explication.

Throughout its jury charge,[6] the court repeatedly stressed that the state bore the burden of proving that

[5] Although the statement of the law in the defendant's request to charge was accurate, we note that the request did not correctly apply the law to the facts of the case. Specifically, the requested instruction provided in relevant part: "[I]f after a full and fair consideration and comparison of all the evidence, you have left in your minds a reasonable doubt indicating that the alleged third party culprit, Richard Berger, *may be responsible* for the drugs that were found in the apartment at 35-16 Mountain Village Road . . . then it would be your duty to acquit the accused, Ruben Berger." (Emphasis added). In light of the state's theory of the case, namely, that both brothers were involved in the illegal narcotics activity in the apartment, the defendant's use of the phrase "may be responsible" is incorrect. Even if the jury found that Richard Berger "may have been" responsible for the drugs, such a finding would not necessarily exculpate the defendant. Rather, evidence of Richard Berger's involvement would have required the defendant's acquittal *only if* the jury determined that Richard Berger *alone* was responsible for the drugs seized from the apartment.

[6] The trial court instructed the jury in relevant part: "Now, in this case as in all criminal prosecutions, the defendant is presumed to be innocent until proven guilty beyond a reasonable doubt. The presumption of innocence was with the defendant when he was first presented for trial in this case, continues with him throughout the trial. As far as you're concerned, the defendant is innocent. He continues to be innocent unless and until such time as all the evidence produced here in the orderly conduct of the case considered in the light of these instructions of law and deliberated upon by you and in the jury room satisfies you beyond a reasonable doubt that he's guilty. The presumption of innocence alone is sufficient to acquit the defendant. The presumption remains with the defendant throughout the trial and unless you are satisfied beyond a reasonable doubt of the defendant's guilt from all the evidence in the case. The burden to prove the defendant guilty of the crime for which he is charged is upon the state. The defendant does not have to prove his innocence. This means the state must prove beyond a reasonable doubt each and every element necessary to the crime charged. Whether the burden of proof, whether the burden of proof resting upon the state is sustained depends not on the number of witnesses nor on the quantity of the testimony but on the nature and quality of the testimony. . . .

the defendant had committed each element of the crimes charged beyond a reasonable doubt. The charge also included a comprehensive instruction regarding the defendant's presumption of innocence, which included the explicit instruction that the defendant was not required to prove his innocence. Moreover, the

"Now, the phrase reasonable doubt has no technical or unusual meaning. You arrive at the real meaning of it by emphasizing the word reasonable. Reasonable doubt is a doubt for which there exists a reasonable basis arising out of the evidence or lack of evidence. It's a doubt which is something more than a guess or a surmise. It's not a conjecture or a fanciful doubt. A reasonable doubt is not a doubt which is raised by somebody simply for the sake of raising doubts nor is it a doubt suggested by the ingenuity of counsel or any of the jurors which is not justified by the evidence or lack of evidence. A reasonable doubt is a doubt based on reason, not on a mere possibility of innocence. It's a doubt for which you can in your own mind conscientiously give a reason.

"A reasonable doubt, in other words, is a real doubt, an honest doubt, a doubt which has its foundation in the evidence or the lack of evidence. It's the kind of doubt which in the serious affairs which concern you in every day life you would pay heed and attention to.

"Now, of course, absolute certainty in the affairs of life is almost never attainable and the law does not require absolute certainty on the part of the jury before you return a verdict of guilty. The state does not have to prove guilt beyond all doubt or to a mathematical or absolute certainty. What the law does require, however, is that after hearing all the evidence, if there is something in that evidence or lack of evidence which leaves in the minds of juries as reasonable men and women a reasonable doubt about the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted. Any conclusion reasonably to be drawn from the evidence which is consistent with the innocence of the accused must prevail. If there's no reasonable doubt, then the accused must be found guilty. The test is one of reasonable doubt. A doubt based on reason and common sense. . . .

"Now, I'm going to instruct you on the criminal statutes with which the defendant is charged in this case. It's your duty to follow these instructions and decide based upon the evidence presented with respect to each charge considered separately whether the state has proven the defendant guilty beyond a reasonable doubt as to each and every element of the crime or crimes charged.

"First, let me say what's obvious. One of the elements in this, as in every criminal case, the state must prove beyond a reasonable doubt that the defendant is the person or one of the persons who committed the crime or crimes charged. That is the element of identity must, of course, be proven beyond a reasonable doubt."

court instructed the jury: "First, let me say what's obvious. One of the elements in this, as in every criminal case, *the state must prove beyond a reasonable doubt that the defendant is the person or one of the persons who committed the crime or crimes charged.* That is the element of identity must, of course, be proven beyond a reasonable doubt." (Emphasis added.) We conclude, therefore, that the trial court's charge, read in its entirety, adequately informed the jury that they must acquit the defendant if they had a reasonable doubt concerning whether Richard Berger alone exercised dominion and control over the drugs.

## IV

The defendant's final claim is that the trial court improperly instructed the jury that they could infer that the defendant possessed the cocaine if they found beyond a reasonable doubt that he was in exclusive possession of the apartment. Specifically, the defendant maintains that the court's instruction was improper because there was insufficient evidence to support a finding that the defendant was in exclusive possession of the apartment.

Where a criminal statute may be violated under alternate theories of liability, we previously have stated that "a jury's verdict must be affirmed if there is sufficient evidence to support a finding of guilty on at least one theory of liability." *State* v. *Dyson*, 238 Conn. 784, 795, 680 A.2d 1306 (1996); see *State* v. *Chapman*, 229 Conn. 529, 539–44, 643 A.2d 1213 (1994). Consequently, in such circumstances, it is not reversible error for "the trial court [to charge] the jury on a factually unsupported basis of criminal liability provided that, in addition to that instruction, the trial court instructs the jury on a factually supported basis." *State* v. *Dyson*, supra, 795.

Here, the trial court instructed the jury that it could conclude that the defendant was in constructive possession of the cocaine if, from the evidence, it found that

the defendant was in exclusive possession of the apartment. The trial court further instructed the jury that it could also conclude that the defendant was in constructive possession of the cocaine on the basis of: (1) evidence that the defendant was in joint possession of the apartment; and (2) other evidence tending to show that the defendant actually knew of the presence of, and exercised control over, the cocaine.[7] Even if we assume, without deciding, that the evidence was not sufficient to support a finding that the defendant was in exclusive possession of the apartment, in light of our conclusion, in part I A of this opinion, that the evidence was capable of supporting a finding that the defendant: (1) had shared possession of the apartment with Richard Berger; and (2) knew the presence of, and exercised control over the cocaine, we conclude that the defendant's claim lacks merit.

[7] The trial court's instructions regarding the element of possession stated in relevant part: "Now, constructive possession requires a showing of two things. Control and knowledge. Now, whether the defendant had possession of the substance in this case is a question of fact for you to decide. And you may, as I've told you, draw reasonable and logical inferences from the evidence.

"Now, in this connection, that is, in connection with possession, there's another rule of law of which you must be aware. The rule is this. Where the defendant is not in exclusive possession of the premises where the narcotics are found. In other words, the situation where the defendant shares possession of the premises with another, you may not infer that he knew of their presence and that he had control of them unless there are some circumstances which tend to support such an inference. That is other evidence tending to support the inference that he knew of their presence and had control or joint control of them. Therefore, if you find that the defendant was not in exclusive possession. In other words, where he was in joint possession of the premises where the narcotics were found, in order to infer that he knew of their presence and he was in control of them, you must also find that there are circumstances which tend to support that inference.

"Now, if, however, you find from all the facts and circumstances that the defendant was in the exclusive possession of the premises where the narcotics were found, you may also infer that he knew of their presence there and that he had control of them. In that situation in order to infer that he knew of their presence and that he had control of them, you do not have to find that there are circumstances which support that inference. . . ."

The judgment is affirmed.

In this opinion BORDEN, KATZ and PALMER, Js., concurred.

BERDON, J., dissenting. The majority tacitly concedes that there was insufficient evidence to justify instructing the jury that the defendant, Ruben Berger, had exclusive possession of the apartment where narcotics were found. Nevertheless, my colleagues hold that this error was harmless, because there was sufficient evidence to justify instructing the jury on an alternative theory of criminal liability. This reasoning cannot withstand scrutiny. The essential problem that inheres in the majority opinion is that we will never know whether the jury convicted the defendant based on nothing more than the theory that he had exclusive possession of the apartment.

"An instruction on a statutory alternative that is not supported by the evidence violates a defendant's fundamental right, protected by the due process clause of article first, § 8, of the Connecticut constitution, to be acquitted unless proven guilty of each element of the charged offense beyond a reasonable doubt. *State* v. *Williams*, [202 Conn. 349, 363, 521 A.2d 150 (1987)]; see also *State* v. *Rodriguez*, 223 Conn. 127, 147, 613 A.2d 211 (1992); *State* v. *Allen*, 216 Conn. 367, 388–89, 579 A.2d 1066 (1990); *State* v. *John*, 210 Conn. 652, 688, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989); *State* v. *Arnold*, 201 Conn. 276, 281–82, 514 A.2d 330 (1986); *State* v. *Reid*, 193 Conn. 646, 666, 480 A.2d 463 (1984). A similar principle applies when the trial court instructs the jury that it may convict a defendant on the basis of a statutory alternative for which there is no evidence. Accordingly, it is firmly entrenched in the common law of this state that [t]he court has a duty to submit to the jury no issue upon which the evidence would not reasonably support a

finding. *State* v. *Williams*, supra, 364; *Batick* v. *Seymour*, 186 Conn. 632, 641, 443 A.2d 471 (1982). [I]f a claim is made against the evidence in the case, and wholly unsupported by proof, it is error to submit it to the jury as if the evidence justified the claim, and without comment, as there is great danger of its leading to an unjust verdict. *Lewis* v. *Phoenix Mutual Life Ins. Co.*, 44 Conn. 72, 88 (1876); see also *Allen* v. *Rundle*, 50 Conn. 9, 33, 47 A. 599 (1882); *Hartford* v. *Champion*, 58 Conn. 268, 276, 20 A. 471 (1890); *McGarry* v. *Healey*, 78 Conn. 365, 367, 62 A. 671 (1905); *Miles* v. *Sherman*, 116 Conn. 678, 682, 166 A. 250 (1933) . . . *Novak* v. *Anderson*, 178 Conn. 506, 508, 423 A.2d 147 (1979).

"The principle of not submitting to the jury any issue for which there is insufficient evidence has roots in our early common law. Justice Swift, writing in 1822, shortly after the adoption of the state constitution in 1818, noted that the jury in its deliberations must find expressly all the facts put in issue, or must negate them all. 2 Z. Swift, Digest of the Laws of the State of Connecticut (1823) p. 774. Similarly, Justice Swift recognized the court's power to direct the jury to say, in their verdict, on which count they find the defendant guilty, and to find him not guilty on the rest, so that if he should be found guilty on an insufficient count, he might take advantage of it by motion in arrest. Id., p. 383. Also imbedded in our common law is the notion that the judge has the power to defend the innocent against an unjust verdict . . . . Id., p. 413. Implicit in the power to set aside a verdict that has no support in the evidence, is the idea that the court should not submit to the jury, in the first instance, an issue that has no support in the evidence. By doing so, the court invites an unjust verdict. . . . [*State* v. *Chapman*, 227 Conn. 616, 627–29, 632 A.2d 674 (1993), superseded by *State* v. *Chapman*, 229 Conn. 529, 643 A.2d 1213 (1994).]" (Internal quotation marks omitted.) *State* v. *Chapman*, supra,

229 Conn. 549–50 (*Berdon, J.*, with whom *Katz, J.*, joined, dissenting).

Accordingly, I dissent.